## IN RE YOUNG.

(No. 5,976.)

(Submitted October 6, 1926. Decided November 3, 1926.)

[250 Pac. 957.]

*Attorneys—Disbarment — Felony Charge — Jurisdiction of Supreme Court—Evidence—Sufficiency.*

Attorneys—Disbarment—Felony Charge—Jurisdiction of Supreme Court.
  1. As against the assertion that the supreme court should not retain jurisdiction of a disbarment proceeding where the accused attorney is charged with felonies committed without the sphere of his duties as such, *held,* under section 8961, Revised Codes of 1921, that where the court, after an investigation by the attorney general and report made to it by him sufficient to move its discretion, has decided to act, its exercise of that discretion does not present a jurisdictional question.

Same—Evidence—Sufficiency.
  2. Evidence in a disbarment proceeding reviewed and *held* sufficient to warrant the referee's findings that the accused had made a false entry upon a blank bank-deposit slip on which by inadvertence the signature of a bank officer had been placed in carbon, and on which on presentation to the bank he had obtained credit for the amount of such entry, thus defrauding the bank of that amount.

Same—Duty of Court.
  3. No duty is imposed upon a court more important than that of preserving to the best of its power and ability the professional integrity and purity of its bar, and where an attorney is guilty

---

1. Disbarment of attorney for criminal act in advance of conviction, see notes in 114 Am. St. Rep. 839; 2 Am. St. Rep. 853; 45 Am. St. Rep. 80; 95 Am. Dec. 340. See, also, 2 R. C. L. 1101.
  3. See 2 R. C. L. 1088.

[77 Mont. 332.]

of dishonest practices and unprofessional conduct, his name should be stricken from the roll, notwithstanding the serious consequences of such a judgment to the accused.

---

[1]    Attorney and Client, 6 C. J., sec. 43, p. 587, n. 30.
[2]    Attorney and Client, 6 C. J., sec. 77, p. 607, n. 90.
[3]    Attorney and Client, 6 C. J., sec. 10, p. 568, n. 22; sec. 37, p. 581, n. 56; sec. 93, p. 612, n. 49 New.

PROCEEDING for the disbarment of H. G. Young a member of the Bar. Judgment of disbarment.

*Mr. H. S. Hepner,* Special Counsel, for the State, submitted a brief and argued the cause orally.

*Mr. George A. Horkan* and *Mr. George W. Farr,* for accused, submitted a brief; *Mr. Farr,* and *Mr. Wm. T. Pigott* of Counsel, argued the cause orally.

We have here a criminal charge filed against the accused charging a felony alleged to have been committed outside the sphere of his official duty as an attorney at law, which charge was dismissed without trial before a jury, or without following the usual criminal procedure to a conclusion. Thereafter and upon the same charge this accusation was filed in this court, without any showing that it was not reasonably or at all possible to obtain justice in the trial court upon the criminal charge. There was no evidence introduced showing a necessity for filing this charge prior to a trial in the district court. This court has always declined to entertain jurisdiction under such a statement of facts. The law of this jurisdiction is: The court will not entertain an accusation to disbar an attorney based upon a criminal charge committed without the sphere of his official duties as an attorney, prior to a criminal prosecution and conviction, unless cogent or urgent reasons are shown either by the accusation itself or by proof in support of it, why this court should do so. (*In re Wellcome,* 23 Mont. 140, 58 Pac. 45; *Id.,* 23 Mont. 213, 58 Pac. 47; *In re Thresher,* 33 Mont. 441, 114 Am. St. Rep. 834, 8 Ann. Cas. 845, 84 Pac. 876.)

The above rule of this court is supported by the authorities generally both in this country and in England. (*In re Tilden,* 3 Cal. Unrep. 393, 25 Pac. 687; *Matter of Stephens,* 102 Cal. 264, 36 Pac. 586; *Ex parte Tyler,* 107 Cal. 78, 40 Pac. 33; *In re Delmas,* 7 Cal. Unrep. 146, 72 Pac. 402; *In re Tipton,* 4 Idaho, 513, 42 Pac. 504; *In re Baum,* 32 Idaho, 676, 186 Pac. 927; *In re Newell,* 174 App. Div. 94, 160 N. Y. Supp. 275; *In re Hughes,* 188 App. Div. 520, 177 N. Y. Supp. 234; *In re Sherin,* 27 S. D. 232, Ann. Cas. 1913D, 446, 40 L. R. A. (n. s.) 801, 130 N. W. 761; *In re Wall,* 107 U. S. 265, 27 L. Ed. 552, 2 Sup. Ct. Rep. 569 [see, also, Rose's U. S. Notes]; see, also, 6 C. J., at page 586.)

The record is entirely silent as to any reason whatever why a prosecution has not been pursued to a conclusion and a conviction had in the district court, or why it cannot be finally prosecuted. There is no charge of corruption of the courts or of any official or person engaged in the prosecution. No intimation of obstruction of justice on behalf of the accused. No charge of tampering with a jury, intimidation of witnesses, destruction of evidence, or any other act or thing that could or would interfere with the proper administration of justice in this matter before the circuit court. There are no cogent or urgent reasons shown why this court should proceed herein.

We believe that a lawyer has the same right to have a charge against him presented to a jury of his peers as the most humble person charged with the same offense. Certainly the high position he holds in his community will not strip him of his constitutional rights to a jury trial upon all criminal charges. Unless he has in some way been instrumental in obstructing the courts in the orderly and usual administration of justice in this case, then this court should not entertain jurisdiction of a disbarment action.

Aside from the constitutional rights of the accused to a jury trial, there is another very forceful argument against the jurisdiction of this court upon this accusation, and that is this: If the criminal charge be found true by a jury, there is always a chance that this court will be called upon to review the charge upon an appeal from a judgment of the

criminal court, and it is but fair that the minds of the court be free and clear to review that judgment without having the record of a disbarment proceeding upon the same facts before them. There being no appeal from the order in disbarment if made by this court, there is more reasons for a clear mind than in the district court where all orders may be reviewed in some manner by this court.

If the court concludes to assume jurisdiction of this charge under the accusation, still the accusation should be dismissed and the referee's findings and conclusions rejected, for the reason, that the evidence introduced at the hearing before the referee is insufficient to support the referee's findings of fact; and his conclusions of law are contrary to the evidence, and against the law. The rule of proof in a disbarment proceeding where the charge is of a criminal nature is the same as the proof in a criminal action, namely, that the charges must be established to a moral certainty and beyond a reasonable doubt. (*In re Griggs* (Mont.), 240 Pac. 820; see, also, *In re Parsons,* 35 Mont. 478, 90 Pac. 163; *State* v. *Wines,* 21 Mont. 464, 54 Pac. 562; *In re Houghton,* 67 Cal. 511, 8 Pac. 52; *Bar Assn.* v. *Sullivan,* 185 Cal. 621, 198 Pac. 7; *In re Stephens,* 84 Cal. 77, 24 Pac. 46; *In re Crum,* 103 Or. 296, 204 Pac. 948; *In re Evans,* 22 Utah, 366, 83 Am. St. Rep. 794, 53 L. R. A. 952, 62 Pac. 913.)

The evidence in this case, in so far as it is of a criminatory nature, is entirely circumstantial, and therefore the rule of circumstantial evidence will necessarily be applied, which is as follows: where conviction is sought solely upon circumstantial evidence, the criminatory circumstances proved must be consistent with each other, and point so clearly to the guilt of the accused as to be inconsistent with any other rational hypothesis other than the guilt of the accused. (*State* v. *Riggs,* 61 Mont. 25, 201 Pac. 272; *State* v. *Schrack,* 60 Mont. 70, 198 Pac. 137; *State* v. *Gomez,* 58 Mont. 177, 190 Pac. 982; *State* v. *Slothower,* 56 Mont. 230, 182 Pac. 270; *State* v. *Postal Telegraph Cable Co.,* 53 Mont. 104, 161 Pac. 953; *State* v. *Brower,* 55 Mont. 349, 177 Pac. 241; *State* v. *Mullins,* 55 Mont. 95, 173 Pac. 788; *State* v. *Sieff,* 54 Mont. 165, 168

Pac. 524; *State* v. *Suiter*, 43 Mont. 31, Ann. Cas. 1912C, 230, 114 Pac. 112.) A conviction cannot be had upon conjectures, however shrewd, suspicions, however justified, or probabilities. however strong (*State* v. *Lewis*, 70 Mont. 61, 223 Pac. 915; *State* v. *McCarthy*, 36 Mont. 226, 92 Pac. 521; *State* v. *Taylor*, 51 Mont. 387, 153 Pac. 275).

We respectfully submit that the court is without jurisdiction to hear and entertain this accusation; and that the evidence when considered as a whole is composed of conjecture, supposition and suspicion, and is not of that clear and convincing kind necessary to warrant a conviction, but is consistent with the innocence of the accused, and is inconsistent with his guilt, and the findings of fact and conclusions and recommendations of the referee should be rejected by the court and this accusation dismissed.

## Opinion: PER CURIAM.

This is a proceeding brought for the disbarment of H. G. Young, a member of the bar of this court. The complaint contains two specifications of misconduct on part of Mr. Young; the first charges him with having feloniously defrauded the American National Bank of Forsyth, Montana, of $85, the second with a forgery. After issue was joined by the defendant the court appointed George Y. Patten, Esq., a former justice of this court, referee to take testimony upon the issues of fact presented by the complaint and answer, and to report the same to this court, together with his findings and conclusions and recommendations thereon.

At the request of the attorney general the court appointed H. S. Hepner, Esq., special counsel to prosecute the disbarment proceedings in accordance with the provisions of section 8953, Revised Codes of 1921.

The referee, after receiving both oral and documentary testimony, made findings of fact upon which he concluded that H. G. Young has been guilty of deceit and crime involving moral turpitude, thereupon recommending that he be disbarred. The special counsel has moved the adoption and counsel for the accused the rejection of the findings and con-

clusions and recommendation of the referee. The matter has been argued fully before us and we have examined the testimony contained in the record, supplemented by accused's affidavit, the documents submitted in evidence, and the briefs filed by counsel, with great care.

The accused, at the threshold, insists that the court should [1] not retain jurisdiction of this proceeding for the reason that the complaint charges him with the commission of two felonies committed without the sphere of his duties as an attorney at law, upon which he has not been given a trial in the district court. *In re Wellcome,* 23 Mont. 140, 58 Pac. 45, is relied on especially. In that case it was said: ''Whether this court will exercise its jurisdiction in cases of crime or misdemeanor falling within the purview of subdivision 5 is discretionary. Unless cogent reasons be furnished by the accusation, or by a showing in support of it, why jurisdiction should be entertained in advance of a criminal prosecution and conviction, we shall refuse to act.'' The subdivision 5 referred to was a portion of section 402, Code of Civil Procedure of 1895. That section provided for the suspension or removal of an attorney and counselor, ''(5) who is guilty of any deceit, malpractice or misdemeanor.''

Section 8961, Revised Codes of 1921, provides that an attorney and counselor may be removed or suspended for any of the following causes, arising after his admission to practice: ''5. Being guilty of deceit, malpractice, crime or misdemeanor involving moral turpitude.''

When *In re Wellcome, supra,* was decided, section 8951, Revised Codes of 1921, was not in existence. That section reads as follows: ''Whenever any verified complaint is filed in the office of the clerk of the supreme court, charging any attorney or counselor at law with having violated his oath as an attorney or counselor, or with having otherwise been guilty of conduct authorizing or justifying his suspension from practice or disbarment, it shall be the duty of the attorney general to represent such complaint in such action or proceeding, and to prosecute the same. He shall first investigate the charges made

and determine whether or not a trial thereof should be had, and report the results of his investigation to the justices of the supreme court, and if, in his judgment, or in the judgment of the justices of the supreme court, a trial should be had, the clerk of the supreme court shall, upon the direction of the attorney general or any justice of the supreme court, issue a summons in the form of a summons in a civil action, setting forth, in brief, the charges contained in the complaint, and requiring said attorney to appear and answer said complaint within such time as the court may designate.''

The complaint in this proceeding was filed with the clerk of this court by R. D. Mountain, president of the American National Bank of Forsyth. Thereupon it became the duty of the attorney general to take action. This he did, but as we were advised he was acquainted with the facts upon which the charges are based prior to the filing of the complaint; he investigated the charges made, and determined, wisely we think, that a trial should be had; he then knew the result of such criminal proceedings as had been taken; he reported the result of his investigations to the justices of this court together with his determination to bring the defendant to trial, called attention to the complaint, and asked for the issuance of a summons. While the attorney general himself might have directed the clerk to issue the summons, it appears that the time for appearance must be designated by the court. The attorney general obviated any question upon the point by requesting the court to make the order of issuance. From the representations made, the justices were of the opinion that a trial should be had, and an order directing the issuance of summons was signed by the chief justice. The complaint as filed was not verified as the statute directs, but this defect was supplied.

Whether, in view of the provisions of section 8951, the doctrine of the *Wellcome Case* can be deemed controlling need not now be determined. In the instant case there was ample to invoke the discretion of the court. In the *Wellcome Case* the court did not decide that it did not have jurisdiction to proceed; quite the contrary; it simply decided that it would

decline to inquire into the truth of the charges unless the accusation or a showing in support thereof, stated facts warranting the exercise of jurisdiction. (See *In re Wellcome,* 23 Mont. 213, 58 Pac. 47.)

When the court shall have made such investigation as it has chosen to make and has concluded sufficient appears to move its discretion, its action in exercising that discretion does not present a jurisdictional question.

It appears from the record that upon the twenty-sixth day of April, 1926, an information was filed in the district court of Rosebud county charging the defendant, H. G. Young, with obtaining money under false pretenses, to which he pleaded not guilty. The case was set for trial upon June 2, 1926. Upon May 24, 1926, the defendant applied to the district court for an order suppressing from use as evidence the deposit-slips known in this case as Exhibits Nos. 1 and 2. The application was granted upon June 3, 1926, and on June 7 the county attorney dismissed the case. The exhibits were introduced without objection in the hearing before the referee.

The evidence discloses and the referee found that Mr. Young [2] for a long time past has been a resident of Forsyth where he practiced his profession of attorney at law as a member of the firm of Young & Young, composed of himself and Margaret Young, his wife. The American National Bank at all times in controversy was a national bank doing business at Forsyth. Beginning upon December 29, 1924, and continuing until January 18, 1926, the firm of Young & Young carried an account with the American National Bank, on which from time to time the members made deposits and drew checks. Most of the business of making deposits and drawing checks was done by Mr. Young. Prior to May 7, 1925, Mr. Young used an original deposit-slip which was left with the bank, the receiving officer of the bank entering the deposit in a small pass-book, which was retained by Young & Young. On or about that date the pass-book was discontinued and instead Mr. Young made use of what is denominated a deposit-pad. This pad consists of alternate white and yellow slips, bound together and numbered consecutively. In the instant case,

the first white slip and first yellow slip were numbered 1 in red, the second white slip and second yellow slip 2 in red, and so on.

The slips provided lines for the depositor's name, the date, the items of deposit, and at the bottom for the signature of the receiving officer. It was customary to place a sheet of carbon paper, furnished with the pad, between the white and yellow slips, so that the yellow slip would reflect what was written upon the white or upper slip. The white slip was torn off and retained by the bank for its records, and the yellow slip was retained by the depositor.

On the 17th of August, 1925, Mr. Young presented to T. J. Wegener, cashier of the bank, the deposit-pad, upon which appeared white deposit-slip No. 1, which contained, in addition to the printing, the name of the depositors, Young & Young, the date, and five items aggregating $63.50, which amount appeared following the word "Total." This deposit-slip is designated Exhibit No. 12. The writing upon the slip when presented to the cashier was in Mr. Young's handwriting, and yellow slip No. 1, designated Exhibit No. 2, was then a duplicate of the white slip, Exhibit No. 12; that is, the writing upon Exhibit No. 12 was reproduced upon Exhibit No. 2.

But in presenting the deposit-pad, Mr. Young gave Mr. Wegener, in addition to the five items represented, an additional check amounting to $50. This item is known as "Kalispell 50." This item was written upon the white slip, No. 12, and the yellow slip, No. 2, by Mr. Wegener. He also changed the totals; the total written by Mr. Young was overwritten upon both slips, and upon No. 2 Mr. Wegener wrote the figures 113.50 above the changed total. Mr. Wegener then signed both slips. The entries made by Wegener upon the slips were made at different times and with an indelible lead-pencil. The exhibits show this beyond doubt.

It was customary for the bank to make to each of its customers at the close of business for the month a statement of the customer's account. A statement of the account of Young & Young was made for the months of August, September, October, November and December. The witness Droise, assistant

cashier, who had charge of that part of the bank's business, testified that to the best of his knowledge and belief the statements were mailed with canceled checks to Young & Young monthly. On cross-examination he said if there should not be to exceed four checks on a statement the bank would not mail the statement unless the depositor requested it. The statement of Young & Young, however, was such as was mailed between the first and third days of each month following the close of business of the next preceding month. The August statement rendered to Young & Young shows three deposits, $100 on August 12, $113.50 on August 17 and $50 on August 20 and seventeen canceled checks. The statements for the other months show nineteen or more canceled checks. Mr. Young said he did not receive any statements from August to October, but in October he received three in the same letter. If he examined them at all it was carelessly. He did not know of the omission of the $85 until January, 1926, when he received notice of the overdraft. Mrs. Young gave testimony tending to corroborate what her husband said.

On January 13, 1926, the account of Young & Young, appeared overdrawn on the bank's books to the amount of $84.39, of which Young & Young were given notice. In response thereto, upon the next day, January 14, Mr. Young presented to Mr. Mountain at the bank a yellow deposit-slip, which was admitted in evidence as Exhibit No. 1, which purports to show that Young & Young deposited with the bank on August 19, 1925, the sum of $85 in currency. Mr. Mountain immediately caused a thorough search to be made in the records of the bank, and himself made search, to discover why the credit indicated by the deposit-slip had not been given the depositors, as a result of which it was found that the records of the bank on August 19, 1925, do not show that Young & Young made any deposit on that day; in fact the records fail to show any deposit upon that day in the sum of $85; without any record of such deposit the books balanced at the close of business nevertheless.

When Exhibit No. 1 was presented to Mr. Mountain he said there must be some mistake and asked if he might keep the

deposit-slip and check up with their accounts, to which Mr. Young replied in the affirmative, left the slip with Mr. Mountain, and went back to his own office. Later in the day Mr. Wegener called Mr. Young and said as the accounts seemed to have been mixed up, he would like to see some other deposit-slips, particularly the one immediately before the one in question, the one immediately after it, and possibly one or two more. These Mr. Young furnished to Mr. Wegener who said he would return them with the one Mr. Mountain had got. On the next morning Mr. Mountain telephoned to Mr. Young that if he would stop in the bank he would make good the error. Mr. Young asked what was necessary, to which Mr. Mountain replied that they would have to square up their records. Mr. Young said he would stop at the bank, which he did shortly thereafter; Mr. Mountain said they had to have something to show where the money had gone, and they wanted a statement from him as to having gotten the money, upon which Mr. Young said, "Prepare your statement, and if it is satisfactory, I will sign it." The statement is upon a letter-head of the American National Bank and reads as follows: "Forsyth, Montana, January 14th, 1926. I hereby certify that on August 19th, 1925, I made a deposit of $85.00 consisting of currency for the credit of Young and Young and received from T. J. Wegener Cashier the usual duplicate deposit slip signed by him—that Young and Young has not received any credit for the deposit to this date. H. G. Young."

Mr. Mountain's version of how he came to ask for the written statement is as follows: "Well, upon his representation that he made the deposit of $85, I explained to Mr. Young that we had no record and that it was necessary in order to give him credit for the $85 to use that much of our undivided profits account, explaining to him I would take a receipt for that amount of money to be used, to show the directors how I spent the $85 of the undivided profits account. At that time Mr. Young suggested that I accept from him a receipted bill for attorney's fees which would eliminate all necessity for explanation. However, I didn't do that. I prepared a

statement showing Mr. Young claimed to have made the deposit and upon his representation he was given credit for $85." Mr. Young was not attorney for the bank, had never been, and had never performed any services for the bank.

Mr. Wegener's testimony is to the effect that when, on August 17, 1925, Mr. Young presented the deposit-pad, he, Wegener, tore off the white slip (marked with the figure 1 in red, Exhibit No. 12), then added the word "Kalispell" and the figures "50," changed the total to 113.50 and signed his name thereto. Then he made the same additions and alterations upon the yellow slip (marked with the figure 1 in red, Exhibit No. 2) but did not sign his name thereto. He then placed the carbon slip between white slip numbered 2 in red and yellow slip No. 2 in red (Exhibit 1), yellow slip 1 being then above white slip 2. Noticing that he had not signed yellow slip No. 1 (Exhibit No. 2) he signed it. When he signed it he did not realize the carbon was between white slip 2 and yellow slip 2. The effect of course was the reproduction of his signature by carbon upon yellow slip 2, Exhibit No. 1. The deposit-pad was then handed to Mr. Young. The referee found that the handwriting on the duplicate deposit-slip, Exhibit No. 1, is a carbon copy or impression of the handwriting of Mr. Young, except the carbon impression of the signature of Mr. Wegener at the bottom thereof; that no deposit of currency or other item to the amount of $85 was in fact made by Mr. Young for the account of the firm of Young & Young on August 19, 1925, or at any time thereabouts; that the entries on the duplicate deposit-slip, Exhibit No. 1, in the handwriting of H. G. Young, were made thereon after the carbon impression of the signature of T. J. Wegener had been placed thereon; that by reason of the presentation of Exhibit No. 1 and the representations made by H. G. Young, the firm of Young & Young obtained a credit at the bank of $85, to which Young & Young were not entitled; that H. G. Young at the time he presented Exhibit No. 1 to the American National Bank and represented and claimed to the bank that he had made the deposit of $85 in currency, on August 19, 1925, knew the same was false and

fraudulent and that the same was so presented by him for the purpose of deceiving and defrauding the bank and wrongfully and unlawfully obtaining from the bank a credit in the sum of $85.

The referee declared in findings X, XI and XII that the carbon copy or impression of the signature of T. J. Wegener upon the yellow deposit-slip, Exhibit No. 1, is identical in every particular with the signature of T. J. Wegener upon deposit-slip Exhibit No. 2; that the carbon impression of the signature of T. J. Wegener upon Exhibit No. 1 is a duplicate impression of the signature which Mr. Wegener wrote upon Exhibit No. 2; that when the signature of Mr. Wegener was made at the bottom of duplicate deposit-slip dated August 17, 1925, that slip was on top of duplicate deposit-slip dated August 19, 1925, Exhibit No. 1, with a slip of carbon paper between (and with the original white slip, No. 2, also between Exhibit No. 2 and the slip of carbon paper) and that the signature of T. J. Wegener which appears upon Exhibit No. 1 is a carbon impression of the original signature of T. J. Wegener which appears upon Exhibit No. 2.

The foregoing findings are fully sustained by the evidence; indeed, the proof upon this feature transcends the requirements of section 10491, Revised Codes of 1921, which says: "The law does not require demonstration; that is, such a degree of proof as, excluding possibility of error, produces absolute certainty, because such proof is rarely possible. Moral certainty is only required, or that degree of proof which produces conviction in an unprejudiced mind." The proof here produces absolute certainty.

Below appears a photograph of Exhibits 1 and 2, 2 being upon the left, 1 upon the right. The original documents are of yellow paper. Upon Exhibit 2 appears the figure 1 in red—it was a duplicate of the first white sheet appearing upon the pad. Upon the face of Exhibit 1 appears the figure 2 in red. White sheet No. 2, so far as the evidence discloses, is not in existence. White sheets from 1 to 14 inclusive, deposited by Young & Young, except No. 2, were produced in

[77 Mont. 332.]

evidence. The signature upon Exhibit No. 2 was made with indelible lead; the signature upon Exhibit No. 1 is a carbon reproduction of the signature upon Exhibit No. 2. This is plain enough from the photograph, but when Exhibit No. 2 is placed upon Exhibit No. 1, one signature being above the other, and the two are held against the light the signatures

Exhibit No. 2.　　　　　　　　　Exhibit No. 1.

are shown to be identical. Every letter in the one covers the corresponding letter in the other exactly. The alignment is perfect. The position of the letters in the written signatures with respect to the printed letters beneath is particularly striking; they occupy the same relative positions.

A handwriting expert was asked as to the probability of one's ability to repeat his signature with exactness and in reply he said the human element so enters in that "no two signatures will bear the same measurement." "Q. What is the probability of a man's signature being repeated exactly alike, in measurements such as you have given here? A. I can quote a competent text book authority,—it is about one in one hundred million."

Some effort was made by the accused to show Exhibit No. 1 might be tracing of No. 2, this upon the theory that accused is the victim of a "frame-up" on part of the bank's officers. This the referee did not credit. In view of the demonstration afforded by the exhibits and in the light of all the testimony in the case he would have been credulous had he done so.

As bearing upon the improbability that accused committed the acts charged his counsel seek to make much of the fact that he "unhesitatingly and willingly presented to the bank officials the slip in question, and all other slips and data requested, so as to enable the bank officials to make an investigation," and he "unhesitatingly signed the statement or receipt reciting that the deposit had in fact been made and the circumstances thereof." But the proof shows he demanded of the bank a credit for $85, presenting Exhibit No. 1 as evidence that he had made the deposit and his August statement to show he had not been given the credit. When the bank called for the other deposit-slips a refusal to furnish them would have looked suspicious. He furnished them in order to accomplish what he set out to do,—obtain $85 from the bank to cover his overdraft. From the evidence the conclusion is inevitable that having in his possession yellow deposit-slip 2, Exhibit No. 1, bearing the signature of T. J. Wegener, cashier of the bank, the accused, H. G. Young, in his own handwriting completed the deposit-slip as it now appears.

There was considerable oral testimony but it is not necessary to comment upon it. It is sufficient to say the referee's findings are fully sustained by the evidence. The referee concluded taking testimony in the matter upon August 11,

1926. His report was filed with the clerk of this court upon September 4, 1926. The accused made an affidavit upon August 18, 1926, which was filed in this court on September 11 and which by agreement of counsel was admitted in evidence. Therein he set forth that the $85 deposit made by him for Young & Young in the American National Bank of Forsyth on August 19, 1925, was made up of $50 collected from one J. L. Wheeler on account of fees in a bankruptcy matter, and which was entered in the day-book of Young & Young under date of August 18, 1925, and "other small cash payments received and accounted for in the books of Young & Young during a period of a few days prior thereto." This but adds to the testimony given on part of the accused, and it is not sufficient to overturn the findings of the referee.

The distinguished counsel for the accused earnestly and [3] eloquently have pointed out the serious consequences to the accused if we shall affirm the findings and conclusion, and carry out the recommendation of the referee. It is urged that it will deprive him of his chosen means of making a livelihood, and will lose him the respect and confidence of his fellows. (*In re Peters*, 73 Mont. 284, 235 Pac. 772.) Of this we are deeply sensible; but "there is no duty imposed upon a court more important than that of preserving to the best of its power and ability the professional integrity and purity of its bar." (*In re Badger*, 4 Idaho, 66, 35 Pac. 839.)

"The position of an attorney and counselor at law is that of an officer of the court. His relation to the court, the bar, and the public is one of trust and confidence. To his integrity and ability are not infrequently intrusted the lives, the liberty, and property of the citizen. Years of time, arduous labor, and constant application are required to elevate him to that professional standing which enables him to discharge with fidelity the responsible duties intrusted to his care. If dishonest practices and unprofessional conduct have caused him to forget his obligations, and lead him to a violation of the sacred trust, his name should be stricken from the roll, and he should be removed from a place in the ranks of the profession

which he is found unworthy to fill." (*In re Catron*, 8 N. M. 253, 43 Pac. 724.)

The evidence in this case goes beyond the requirement that "the evidence to sustain the charge should be of such a character that it satisfies the court to a reasonable certainty that the charges are true." (*State ex rel. Stapleton* v. *Wines*, 21 Mont. 464, 54 Pac. 562; *In re Wellcome*, 23 Mont. 450, 59 Pac. 445; *In re Parsons*, 35 Mont. 478, 90 Pac. 163.)

The judgment of the court is that H. G. Young be removed from his office as attorney and counselor at law, that his name be stricken from the roll, and that he be forever disbarred and prohibited from practicing law in this state.